# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

NATIONAL BEVERAGE SYSTEMS, INC.,

                                   CASE NO. 12-10658
    Plaintiff,                       HON. LAWRENCE P. ZATKOFF

v.

LEONARD FOUNTAIN SPECIALITIES, INC.

    Defendant.

_____/

## OPINION AND ORDER

AT A SESSION of said Court, held in the United States Courthouse,
in the City of Port Huron, State of Michigan, on June 25, 2012.

PRESENT: THE HONORABLE LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

### I. INTRODUCTION

This matter is before the Court on Defendant Leonard Fountain Specialities, Inc.'s Motion to Dismiss National Beverage Systems, Inc.'s Complaint [dkt 8]. The parties have fully briefed the Motion. The Court finds that the facts and legal arguments are adequately presented in the parties' papers such that the decision process would not be significantly aided by oral argument. Therefore, pursuant to E.D. Mich. L.R. 7.1(f)(2), it is hereby ORDERED that the Motion be resolved on the briefs submitted. For the reasons set forth below, Defendant's Motion to Dismiss is DENIED.

### II. BACKGROUND

Plaintiff filed its Complaint on February 14, 2012, against Defendant based on various

antitrust and anti-competition claims.[1] Plaintiff was incorporated in 2009, as a successor to a small business operating since 2003. Plaintiff sells discount soft drink syrups and the related equipment, including $CO_2$ tanks (hereinafter referred to as the "Syrup Business"). Plaintiff's customers comprise restaurants and bars in and around Wayne, Macomb, and Oakland Counties ("Tri-County Region").

Defendant competes against Plaintiff. Defendant's market share comprises approximately 90% of the Syrup Business in the Tri-County Region. Plaintiff controls the remaining market share, except for a small share controlled by a third company, Penguin. Plaintiff alleges that Defendant is taking predatory steps to "eliminate [Plaintiff] as a competitor through illegal means, including mail and wire fraud, defamation, tortious interference, theft of trade secrets, sham litigation, illegal refusals to deal with customers of [Plaintiff]'s, and predatory pricing." Compl. ¶ 16.

Plaintiff brings the following claims against Defendant: (Count I) monopolization under Section 2 of the Sherman Act; (Count II) attempted monopolization under Section 2 of the Sherman Act; (Count III) tortious interference; (Count IV) fraud; (Count V) theft of trade secrets; (Count VI) defamation; (Count VII) injurious falsehood; and (Count VIII) violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §1961, *et seq*. On March 9, 2012, the Court declined to exercise supplemental jurisdiction and dismissed Plaintiff's Counts III–VII as state-law claims. On March 27, 2012, Defendant filed the instant motion requesting that the Court dismiss Counts I, II, and VIII (Plaintiff's remaining Counts) as failing to state a plausible claim for relief under Fed. R. Civ. P. 12(b)(6).

---

[1] Since the Court is reviewing Defendant's request for dismissal on the pleadings, the Court takes the allegations in Plaintiff's Complaint as true.

### III. STANDARD OF REVIEW

A motion brought pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief may be granted tests the legal sufficiency of a party's claims. The Court must accept as true all factual allegations in the pleadings, and any ambiguities must be resolved in that party's favor. *See Jackson v. Richards Med. Co.*, 961 F.2d 575, 577–78 (6th Cir. 1992). While this standard is decidedly liberal, it requires more than a bare assertion of legal conclusions. *See Advocacy Org. for Patients & Providers v. Auto Club Ins. Ass'n*, 176 F.3d 315, 319 (6th Cir. 1999). A party must make "a showing, rather than a blanket assertion of entitlement to relief" and "[f]actual allegations must be enough to raise a right to relief above the speculative level" so that the claim is "plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). "A claim has facial plausibility when the party pleads factual content that allows the court to draw the reasonable inference the defendant is liable for the alleged misconduct." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 570).

In deciding a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), this Court may only consider "the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings, and matters of which the [Court] may take judicial notice." 2 James Wm. Moore et al., *Moore's Federal Practice* ¶ 12.34[2] (3d ed. 2000). If, in deciding the motion, the Court considers matters outside the pleadings, the motion will be treated as one for summary judgment pursuant to Fed. R. Civ. P. 56. *See* Fed. R. Civ. P. 12(d).

### IV. ANALYSIS

**A. ANTITRUST CLAIMS (COUNTS I & II)**

3

Defendant argues that Plaintiff's antitrust claims under Section 2 of the Sherman Act must fail because Plaintiff has not alleged: (1) a relevant market; (2) a substantial adverse effect on interstate commerce; and (3) an antitrust injury due to Defendant's conduct. Section 2 of the Sherman Act makes it unlawful for a person to "monopolize, or attempt to monopolize . . . any part of the trade or commerce among the several States." 15 U.S.C. § 2. Here, Plaintiff has pleaded both claims, a monopolization and an attempted monopolization claim. While the language in Section 2 is broad, the United States Supreme Court has constructed the details underlying Section 2 claims. The threshold inquiry is to determine the relevant market.

**1. Relevant Market**

The relevant market comprises two elements: the relevant product market and the relevant geographic market. The relevant product market consists of the line of goods or services that are reasonably interchangeable in use. *United States v. E. I. De Pont de Nemours & Co.*, 351 U.S. 377, 404 (1956). The relevant geographic market consists of where sellers operate and where purchasers can predictably turn for supplies. *Re/Max Int'l., Inc. v. Realty One, Inc.*, 173 F.3d 995, 1016 (6th Cir. 1999) (citation omitted).

Taking all of the allegations in the Complaint as true, Plaintiff alleges that the relevant market is the "discount soft drink syrup market," excluding name brand syrups (i.e., Coke and Pepsi). Compl. ¶ 61. The discount syrups are not "reasonably interchangeable" with name brand syrups because of the "high price difference between" discount and name brand syrups. Compl. ¶ 63–65. Plaintiff further alleges that customers in the Tri-County Area, including certain nightclubs and bars, purchase discount syrups and do not switch to name brand syrups. Compl. ¶ 66.

Defendant argues that discount soft drink syrups is too narrow of a market; the relevant

market should include all soft drink syrups. Defendant relies on *Smith v. Multi-Flow Dispensers of Ohio, Inc.*, No. 96-4185, 1999 WL 357784, at *1 (6th Cir. May 14, 1999) (unpublished table opinion at 181 F.3d 103). The holding in *Multi-Flow* concerned excluding certain customers that owned national franchised restaurants from the relevant market of locally owned restaurants that purchased soft drink syrups. *Id.* at *4. The court, however, did not decide whether name brand syrups and discount syrups could be separated into two distinct markets—the exact issue before the Court. *See id.* While the holding in *Multi-Flow* is not directly on point, the court did note as dicta that the relevant market could be limited to generic soft drinks used for "mixers." *Id.* at *4. Along with relying on *Multi-Flow*, Defendant cites to three other district court opinions from various circuits. Similarly, Defendant's other legal authority fails to support its position.[2]

Plaintiff also alleges the relevant geographic market, limiting the competition in the Syrup Business to the Tri-County Region. Compl. ¶ 2. Plaintiff alleges that the geographic market is limited to the Tri-County Region because of shipping costs and emergency maintenance support offered to customers for the related soft drink syrup equipment. Because syrups are sold in boxes weighing 50 lbs., and delivery costs increase as the distance from the packaging facility increases, customers located far from the packaging facility are not economical to service. Customers also expect that sellers like Plaintiff and Defendant will repair and service any syrup dispensing

---

[2]*Coca-Cola Bottling Co. of Shreveport, Inc. v. Coca-Cola Co.*, 696 F. Supp. 97, 131 (D. Del. 1988)(finding that a relevant market limited to only Coca-Cola products was too narrow, but noting that the product market could be reasonably drawn as "national brand soft drinks or national brand diet coals"); *Barq's Inc. v. Barq's Beverages, Inc.*, 677 F. Supp. 449, 455 (E.D. La. 1987) (finding with minimal analysis that the relevant product market is not limited to just root beer, but all soft drinks); *FTC v. Coca Cola Co.*, 641 F. Supp. 1128, 1132 (D.D.C. 1986) (finding that the relevant product market in regards to Coca Cola Co. and Dr. Pepper was the national carbonated soft drink market), vacated, 829 F.2d 191 (D.C. Cir. 1987).

equipment, including immediate responses to equipment failures. The seller of syrups and equipment, therefore, must be located close to the customers to remain profitable. Plaintiff, however, does ship an energy drink syrup nationally due to its significantly higher profit margin.

Defendant does not challenge these geographic limitations. As such, the Court finds that Plaintiff has sufficiently alleged the relevant market for purposes of surviving a motion to dismiss under Fed. R. Civ. P. 12(b)(6).

**2. Effect on Interstate Commerce**

Plaintiff has defined the relevant geographic market as the Tri-County Region. Defendant argues, by limiting the relevant market to within the State of Michigan, Plaintiff's antitrust claims must fail as Defendant's alleged antitrust conduct has no substantial effect on interstate commerce. Courts that have reviewed similar challenges under Section 2, however, have found a sufficient effect on interstate commerce even where the relevant market is limited to a geographic area inside a state. *Mandeville Island Farms v. Am. Crystal Sugar Co.*, 334 U.S. 219, 236–37 (1948); *United States v. Paramount Pictures, N.Y.*, 334 U.S. 131, 173 (1948); *Triple M Roofing Corp. v. Tremco, Inc.*, 753 F.2d 242, 246 (2d Cir. 1985); *Feldman v. Jackson Mem'l Hosp.*, 509 F. Supp. 815, 819–21 (S.D. Fla. 1981); *Myers v. Shell Oil Co.*, 96 F. Supp. 670, 674–75 (S.D. Cal. 1951).

The United States Supreme Court analyzed a case where Oklahoma liquor retailers brought a Sherman Act action against state liquor wholesalers, alleging that the wholesalers had divided up the *state market* into exclusive territories to control the prices at which liquor was sold to the retailers. *Burke v. Ford*, 389 U.S. 320, 321 (1967). The United States Supreme Court found that the state market divisions created by the wholesalers had substantially affected interstate commerce because liquor was not produced in Oklahoma at the time, but purchased from out-of-state distillers.

*Id.* While the market division occurred in the state and was not directed toward interstate commerce, the reduction in competition "almost surely resulted" in fewer purchases from out-of-state distillers. *Id.* at 322.

Similar to *Burke*, and resolving all ambiguities in favor of Plaintiff, both parties' use products in their business that are purchased in interstate commerce. Plaintiff also produces, sells, and ships an energy syrup that competes in a national market. Compl. ¶ 74. As such, while the relevant market regarding soft-drink syrups is geographically limited to an area inside the state of Michigan, it is reasonable to infer that excluding Plaintiff from the Tri-County Region and reducing competition has a substantial effect on interstate commerce.

### 3. Monopoly Claim

A monopolization claim requires a plaintiff to show that a defendant has "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966); *see Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 480 (1992). Monopoly power is defined as the "power to control prices or exclude competition." *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 782 (6th Cir. 2002) (citation omitted). There must be a general intent on the part of the defendant to exclude others from the market. *Id.* Such exclusion that is not the result of business efficiency is always deliberately intended. *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 602 (1985) (citation omitted). In determining whether conduct may be characterized as exclusionary, "it is relevant to consider its impact on consumers and whether it has impaired competition in an unnecessarily restrictive way." *Id.* at 605. "If a firm

has been attempting to exclude rivals on some basis other than efficiency, it is fair to characterize its behavior as predatory." *Id.* (internal quotation omitted)

Plaintiff has sufficiently pleaded allegations that Defendant has possession of monopoly power in the relevant market. Plaintiff alleges that Defendant controls 90% of the Syrup Business. Compl. ¶ 11. Aside from Plaintiff, Penguin, another small company, competed with Defendant, but has ceased growing because of Defendant's predatory tactics. Comp. ¶ 13. Penguin has begun focusing on other business lines. Compl. ¶ 60. In the past, Defendant has used its powers to eliminate other rivals, including Michigan Beverage. Compl. ¶¶ 15, 60.

Plaintiff has also sufficiently pleaded that Defendant has a general intent to exclude Plaintiff from the market. Most notably, Plaintiff has alleged that a salesman of Defendant has told Plaintiff's customers that they would receive "below-cost pricing" on Defendant's products for fourteen months "in order to put [Plaintiff] out of business." Compl. ¶ 26. Plaintiff makes a similar allegation in ¶ 40, alleging that Defendant told Plaintiff's customers that it was targeting all of Plaintiff's accounts and that it is "going to put [Plaintiff] out of business by whatever means necessary." Compl. ¶ 40.

The Complaint contains numerous other allegations regarding conduct to exclude Plaintiff from the market that is not based on "business acumen" or a "superior product." *See Grinnell*, 384 U.S. at 570–71. Plaintiff alleges the following:

a. Defendant engaged in "industrial espionage to steal [Plaintiff]'s customer list[,]" which involved Defendant's employee following Plaintiff's delivery driver while the driver was making his stops. Compl. ¶ 19. Defendant's employee then visited the stops the following day, attempting to get the customer to switch to Defendant.

8

        Compl. ¶ 21. Defendant has also had an employee identify himself as a Michigan Department of Agriculture agent to gain access to Plaintiff's facilities. Compl. ¶ 23. From these activities, Defendant has learned all of Plaintiff's customers and now possesses a complete list of Plaintiff's customers.

b.    Defendant used this information to visit Plaintiff's customers and offer them below-cost pricing on Defendant's product for fourteen months. Compl. ¶ 25–28. Defendant also offered to replace the customer's current stock of Plaintiff's syrups for free, then provided Plaintiff's syrups it obtained from that customer, who had switched to Defendant, to customers that declined to switch from Plaintiff to Defendant. Defendant has also falsely told Plaintiff's customers that "[Plaintiff] was on the brink of going out of business," "operates without a food license, is under criminal investigation, uses unsanitary manufacturing methods, and that its products are . . . so acidic that the product burns holes in plastic bags." Compl. ¶¶ 36–37.

c.    Defendant also has a bulk $CO_2$ delivery system. Defendant purportedly contracts with its customers for $CO_2$ delivery. The contracts include a clause that the customers must exclusively buy $CO_2$ from Defendant. Defendant then refuses to refill the $CO_2$ tanks of any Defendant customer that has switched to Plaintiff's syrups. If Defendant customers then attempt to switch $CO_2$ providers, Defendant sues the customer under the exclusivity provisions of the $CO_2$ contracts. Compl. ¶ 56–59.

    d.    On January 15, 2008, a letter purportedly sent by Defendant's legal counsel to Plaintiff's predecessor claimed that any customer using Defendant's $CO_2$ delivery equipment was contractually obligated to exclusively use Defendant's syrup. Compl. ¶ 44. According to Plaintiff, no such contracts existed. On March 28, 2008, Defendant filed a "sham litigation" against Plaintiff's predecessor claiming that Plaintiff's predecessor tortiously interfered with contracts between Defendant and five customers. Compl. ¶ 48. The case settled. Compl. ¶ 53. On May 4, 2011, Defendant sent an e-mail to state regulatory agencies urging the agency to inspect Plaintiff. Compl. ¶ 42.

While the specific predatory tactics viewed in isolation may not be sufficient to plead a monopolization claim, viewing all of Defendant's alleged predatory tactics, Plaintiff has sufficiently pleaded that Defendant is willfully maintaining its monopoly in the relevant market. Limiting Plaintiff's growth with unlawful tactics and forcing previous competitors out of business, stifles competition. Defendant's actions, if true, have indisputably harmed Plaintiff and competition in the relevant market. Accordingly, the Court finds that Plaintiff has alleged sufficient facts to state a monopolization claim that is plausible on its face. Defendant is denied dismissal of Plaintiff's monopolization claim (Count I).

### 4. Attempted Monopolization Claim

To establish a claim of attempted monopolization under Section 2 of the Sherman Act, a plaintiff must show "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993). The specific intent to monopolize

consists of "a specific intent to destroy competition or build [a] monopoly." *Times-Picayune Publ'g Co. v. United States,* 345 U.S. 594, 626 (1953). The "dangerous probability" determination is made in light of the defendant's "ability to lessen or destroy competition" in the relevant market. *Spectrum Sports, Inc.*, 506 U.S. at 456. The relevant market for an attempted monopolization is determined by the same standards applied in a monopolization claim. *See United States v. Microsoft Corp.*, 253 F.3d 34, 81 (D.C. Cir. 2001) (en banc) (per curiam) ("Defining a market for an attempted monopolization claim involves the same steps as . . . a monopoly maintenance claim . . . ."); *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1438 (9th Cir. 1995) ("[T]he minimum showing of market share required in an attempt case is a lower quantum than the minimum showing required in an actual monopolization case.").

Having found that Plaintiff has sufficiently pleaded a monopolization claim, the Court also finds that Plaintiff has pleaded sufficient facts to state an attempted monopolization claim. Defendant is denied dismissal of Plaintiff's attempted monopolization claim (Count II).

### B. RICO VIOLATION (COUNT VIII)

Plaintiff alleges that Defendant violated RICO based on mail and wire fraud. A plaintiff asserting a violation of RICO must allege: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Kenty v. Bank One*, 92 F.3d 384, 389 (6th Cir. 1996). In order to establish "racketeering activity," the plaintiff must allege a predicate act. *Id.* The mail fraud and wire fraud statutes are included as "racketeering activity" under RICO. 18 U.S.C. § 1961(1)(B). Both the mail fraud and the wire fraud statutes, 18 U.S.C. §§ 1341, 1343, make it a crime to use the mail or wire for purposes of executing any "scheme or artifice to defraud." Because fraud is a component of mail and wire fraud, Fed. R. Civ. P. 9(b) requires allegations to be pleaded with particularity. To meet

the heightened pleading standard, Plaintiff must allege "the time, place, and content of the alleged misrepresentations on which [it] relied; the fraudulent scheme; the fraudulent intent of the defendant[]; and the injury resulting from the fraud." *U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 342 F.3d 634, 643 (6th Cir. 2003) (citation omitted).

Defendant argues that Plaintiff's RICO claim is deficient in two respects: first, Plaintiff fails to allege the predicate acts of mail fraud and wire fraud with sufficient particularity pursuant to Fed. R. Civ. P. 9(b); second, Plaintiff has only alleged "sporadic activity," not a connected series of offenses, which is insufficient to support a RICO claim.

Contrary to Defendant's arguments, Plaintiff provides two specific factual allegations related to wire fraud and mail fraud that satisfy the heightened pleading standards under Fed. R. Civ. P. 9(b). As to wire fraud, Plaintiff alleges that on May 4, 2011, "[Defendant] sent . . . a fraudulent e-mail pretending to be from [Plaintiff], to state regulatory agencies." Compl. ¶ 42. As to mail fraud, Plaintiff alleges that on January 15, 2008, "[Defendant]'s legal counsel sent a fraudulent letter to Plaintiff's predecessor which claimed to have contracts with users of its $CO_2$ delivery equipment that forbid these companies from using another supplier's syrup product on [Defendant]'s equipment." Compl. ¶ 44. Plaintiff further alleges that Defendant made defamatory statements to Plaintiff's customers through a telephone as a part of a scheme to defraud and exclude Plaintiff from the Syrup Business. Compl. ¶¶ 60, 123. Plaintiff has adequately alleged specific times, content of the fraudulent statements, the scheme, the intent of Defendant in doing so, and the injury to Plaintiff. *See Bledsoe*, 342 F.3d at 643. Based on the other allegations in Plaintiff's Complaint, a reasonable inference can be drawn that Defendant used mail and wire fraud as part of a connected scheme to exclude Plaintiff from the market, and intended for such scheme to continue until Plaintiff was

excluded from the market. Accordingly, Plaintiff's RICO Count survives Defendant's Motion to Dismiss.

## V. CONCLUSION

Accordingly, for the above reasons, IT IS HEREBY ORDERED that Defendant's Motion to Dismiss [dkt 8] is DENIED.

IT IS SO ORDERED.

            S/Lawrence P. Zatkoff
            LAWRENCE P. ZATKOFF
            UNITED STATES DISTRICT JUDGE

Dated: June 25, 2012

### CERTIFICATE OF SERVICE

The undersigned certifies that a copy of this Order was served upon the attorneys of record by electronic or U.S. mail on June 25, 2012.

            S/Marie E. Verlinde
            Case Manager
            (810) 984-3290